UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JORGE GONZALES on behalf of his minor child A.G.; TODD MERRELL on behalf of his minor child A.M.; MANUEL MORALES and VERONICA MORALES on behalf of their minor child Z.M.; HENRY MUNOZ and MISTY MUNOZ on behalf of their minor child I.M.; ERASMO SALAZAR and ELLEN SALAZAR on behalf of their minor children C.S. and S.S.; ROBERT SANCHEZ and TIFFINY SANCHEZ on behalf of their minor child I.S.; SILVIA OCHOA on behalf of her minor child D.O.; SONIA RAMIREZ on behalf of her minor child V.R., | Case No. 4:18-cv-00092-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| BURLEY HIGH SCHOOL; CASSIA JOINT SCHOOL DISTRICT 151; GAYLEN SMYER in his official and individual capacity; SANDRA MILLER in her official and individual capacity; LEVI POWER in his official and individual capacity; and DOES I-X, | |
| Defendants. | |

# I. INTRODUCTION

This case involves First Amendment retaliation claims for disciplinary actions taken against plaintiff members of the Burley High School ("BHS") cheer team ("Plaintiffs"). Plaintiffs engaged in a peaceful "sit-in" during an early morning cheer

practice to protest bullying and favoritism by their cheer coach. Plaintiffs were ultimately suspended from the cheer team for three weeks as a punishment and had to sign a list of stipulations agreeing to additional punishment to be let back on the squad. Although Plaintiffs signed the stipulations, they each also reserved their right to engage in the school district's grievance process. In response, the BHS administration dismissed Plaintiffs from the cheerleading team for the rest of the school year.

Plaintiffs thereafter filed the instant suit, alleging two claims of retaliation in violation of the First Amendment. Plaintiffs' first claim for relief is for the retaliation they experienced for initiating the sit-in, while Plaintiffs' second claim for relief is for the retaliation they purportedly suffered as a result of reserving their rights to engage in the school district's grievance process. Defendants BHS, Cassia Joint School District 151, Superintendent Gaylen Smyer, Assistant Superintendent Sandra Miller, and Principal Levi Power (collectively referred to hereinafter as "Defendants") seek summary dismissal of both of Plaintiffs' claims. Plaintiffs filed a motion for partial summary judgment, seeking summary adjudication of their claim of retaliation for reserving their rights to grieve the school district's decision. On June 5, 2019, the Court held oral argument on both motions. For the reasons stated herein, the Court DENIES Defendants' Motion for Summary Judgment and GRANTS Plaintiffs' Motion for Partial Summary Judgment.

## II. BACKGROUND[1]

The BHS cheer team won the state championships during the 2015-2016 and

---

[1] Unless otherwise referenced, the following facts are taken from Plaintiffs' Complaint. Dkt. 1. For purposes of the present motions, the following background facts have not been disputed.

2016-2017 school years under head coach Heidi Smith. Eight of the nine plaintiff cheerleaders were on at least one of the state championship teams. In the spring of 2017, the BHS administration hired a new coach, Laine Mansfield, as the head coach of the cheer team. Mansfield had previously served for a portion of a year as an assistant junior high cheer coach.

In April 2017, Mansfield conducted tryouts for the 2017-2018 BHS cheer team. Mansfield's temperament and fairness immediately concerned Plaintiffs. For instance, Victoria Aragon, an incoming senior who had been a member of both state championship cheer teams, did not make the squad for her senior year. Due to a personal dispute with Aragon, Mansfield prohibited Plaintiffs from communicating with, associating with, or otherwise talking about Aragon while at cheerleading practice or in the presence of Mansfield. Mansfield verbally reprimanded Plaintiffs if she observed them communicating or associating with Aragon.

Mansfield also demonstrably favored the younger members of the cheer team she had coached as an assistant coach of the junior high team, including her own daughter. For Plaintiffs, Mansfield enforced mandatory attendance for practices and events, and made no exceptions for conflicting school-related activities, family functions, or any other non-emergency scheduling conflict. If Plaintiffs missed a single practice, they were excluded from practices and important games and events during the week the practice was missed. Mansfield also punished one Plaintiff, A.G., by excluding her from participating in a cheer parade when she missed practice to attend a previously scheduled school yearbook camp. This punishment was given even though—several months prior—

Mansfield had excused A.G. from attending practice that day so she could attend the yearbook camp. However, Mansfield rescheduled the entire team's practice when her own daughter or other junior members of the team had a conflict.

Mansfield also routinely bullied Plaintiffs by degrading their cheerleading abilities and appearance. Mansfield told Plaintiffs they "sucked and that she had no idea how [they] ever won a state title," claimed they looked "trashy and gross," criticized Plaintiffs during practice by stating they "looked really dumb, ugly or sloppy," and talked negatively about certain Plaintiffs to other members of the team, including describing one Plaintiff as "the most loud, obnoxious person she'd ever met" and complaining how "lazy" another Plaintiff was. Dkt. 29-3, Ex. 2, at 15, 24, 33, 34.

Finally, Mansfield demonstrated a lack of basic knowledge of, or concern for, the safety requirements cheer coaches are required to observe. For example, flyers— cheerleaders who are lifted or thrown into the air—were repeatedly dropped on the floor during practice. Although such falls can cause paralysis or even death, Mansfield would tell the flyers to "brush it off, suck it up, and do it right next time" when they were dropped. *Id*. at 28. Yet Mansfield would not teach the girls the appropriate way to do the stunt or ensure they had the basics down before they again attempted dangerous acrobatics. *Id*. Mansfield also put inexperienced cheerleaders together in groups, gave the squad no direction on how to safely stunt, paired stunt groups incorrectly based on their size, risking serious injury, and tried to make the cheerleaders attempt illegal stunts. *Id*.

Plaintiffs and their parents voiced numerous complaints to the BHS administration about Mansfield's behavior and attended meetings with BHS and Cassia Joint School

District administrators. In response to such complaints, the BHS administration put Mansfield on a Performance Improvement Plan, requiring her to, among other things, "keep her communication positive" with members of the cheer team, refrain from texting cheerleaders one on one, refrain from discussing sensitive issues about the cheerleaders with others, and to be "consistent and fair with all girls in the cheer program[.]"[2] Dkt. 26-10, Ex. 5, at 18:1-25:5. When Mansfield's behavior did not improve, Plaintiffs organized a sit-in during their early morning practice on September 29, 2017, to protest Mansfield's "bullying, favoritism, and incompetence." Dkt. 26-1, at 2.

At approximately 8:10 a.m. on the day of the protest, fourteen BHS cheerleaders (nine of whom are plaintiffs in this suit), entered the BHS gym at the end of one of their before-school practices. The protesting cheerleaders wore their regular school clothes (rather than their designated practice uniforms) and sat on the bleachers for approximately two minutes until they were asked to leave by BHS Athletic Director Gordon Kerbs. When asked to leave the gym, one of the Plaintiffs argued with Kerbs and Assistant Principal Andrew Wray, stating the cheerleaders had a right to peacefully protest. However, all of the girls ultimately left the gym and went to the library with Kerbs and Wray.

At the end of the day on September 29, 2017, Plaintiffs were informed that they were suspended from the cheerleading team for the next week. On October 5, 2017, the BHS Principals' Office gave each Plaintiff a list of additional punishments to which

---

[2] It is not clear from the record whether Plaintiffs were aware the District had placed Mansfield on a Performance Improvement Plan.

Plaintiffs and their parents were required to agree in order for Plaintiffs to be allowed

back on the cheerleading team. The October 5, 2017, letter provided:

> In order to rejoin the cheer squad at [BHS] each of the following must take place:
>
> > -You will serve a suspension from competing in events/games until October 23, 2017, you will be allowed and expected to attend all practices starting Monday, October 9[,] 2017. You will be expected to attend and sit in warm up gear with the coaches during any games/events for the remainder of the suspension starting Monday, October 9[,] 2017.
> >
> > -You will vocally address the entire cheer squad and coaches Monday morning, October 9[,] 2017 with a sincere apology.
> >
> > -You will agree to participate in a 4-hour service project to be completed on a Saturday before October 23, 2017. The date will be given to you by the coaches.
> >
> > -By October 23, 2017 you will write a one-page paper explaining what you have learned about yourself through this experience and will come up with one team building activity/idea and present that in your paper to the coaches.
> >
> > -You will be expected to follow the rules in the cheer handbook, failure to follow the rules will result in dismissal from the squad.
> >
> > -You will have and maintain a positive attitude and work ethic with all aspects of the cheer squad moving forward.
> >
> > -Any negative texts/social media posts about any member of the cheer squad, cheer coaching staff or [BHS] will result in dismissal from the team.
> >
> > -Any parent boosters [sic] activity must be cleared through the coaches.
> >
> > -This letter must be signed by the cheerleader and a parent/guardian and hand delivered [to BHS administration] by

3:30 PM on Friday October 6, 2017. Failure to do so will result in dismissal from the cheer squad.

Dkt. 25-8, Ex. S.

Each of the Plaintiffs and their parents returned signed stipulation agreements to the BHS administration by October 6, 2017. However, Plaintiffs also attached a one-sentence letter stating, "I/We are signing this but we want to reserve our right to be afforded our rights in the districts [sic] grievance process[.]" *Id*.

On October 7, 2017, Cassia School District Superintendent Gaylen Smyer ("Superintendent Smyer") and Assistant Superintendent Sandra Miller ("Assistant Superintendent Miller") sent each Plaintiff a letter dismissing them from the cheer team for the 2017-2018 school year. The dismissal letter stated, in part:

> It is clear to district level administration that while the stipulation agreements were returned the presence of the additional page or addendum suggests a continued conflict on the part of the cheer team, the individual student and parents with the coach and school administration. Such an expression is interpreted to be a desire to utilize the grievance process as opposed to the solution propounded by the administration. It is the belief of the school superintendent and the assistant superintendent [that] the school and the cheer team would be best served by revoking the membership of [each Plaintiff] on the [BHS] cheer team effective Monday, October 9, 2017 at 8:00 a.m.

Dkt. 25-8, Ex. T. Cheerleaders who participated in the sit-in and signed the stipulation letter, but who did not reserve their right to engage in the school district's grievance process, were allowed back on the cheer team.

Plaintiffs thereafter filed the instant suit alleging two counts of retaliation in violation of the First Amendment under 42 U.S.C. § 1983. Plaintiffs' first claim for relief alleges that the Defendants unlawfully retaliated against Plaintiffs by imposing a three-

week suspension and additional punishments in response to Plaintiffs engaging in their constitutionally protected right to peacefully protest (hereinafter "Claim One"). Plaintiffs' second claim for relief alleges Defendants unlawfully retaliated against Plaintiffs by dismissing them from the cheerleading team for reserving their rights to engage in the school district's grievance process (hereinafter "Claim Two").

On January 11, 2019, Defendants and Plaintiffs filed cross-motions for summary judgment. Defendants seek summary judgment with respect to both of Plaintiffs' First Amendment retaliation claims. Plaintiffs contend a genuine issue of disputed material fact precludes summary judgment on Claim One, but suggest the undisputed facts establish they are entitled to summary judgment on Claim Two.

### III. LEGAL STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides that judgment shall be granted if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). According to Rule 56, an issue must be both "material" and "genuine" to preclude entry of summary judgment. *Id*. An issue is "material" if it affects the outcome of the litigation. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). That is, a material fact is one that is relevant to an element of a claim or defense which might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id*.

On the other hand, an issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn*, 523 F.2d at 464 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)). Because factual disputes are to be decided at trial, in ruling on summary judgment motions, the Court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Elec. Serv*., *Inc*., 809 F.2d at 630. Moreover, all inferences must be drawn in the light most favorable to the nonmoving party. *Id*. at 631.

Finally, where, as here, the parties both move for summary judgment, the Court will consider each motion on its own merits. *Fair Housing Council of Riverside Cty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In ruling on cross-motions, the Court will consider the entirety of each party's evidentiary submission, regardless of which motion (or opposition) the evidence accompanied. *Id*. at 1136–37.

## IV. ANALYSIS

### A. Student Speech

It is well-settled that students in public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Comty. Sch. Dist*., 393 U.S. 503, 506 (1969). While the First Amendment rights of students "are not automatically coextensive with the rights of adults in other settings," and educators are granted "substantial deference as to what speech is appropriate," such

deference "does not mean abdication." *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001) (internal quotation marks and citation omitted). As such, "there are situations where school officials overstep their bounds and violate the Constitution." *Id*.

In *Chandler v. McMinnville Sch. Dist*, 978 F.2d 524, 529 (9th Cir. 1992), the Ninth Circuit reviewed the Supreme Court's student speech cases and identified three categories of speech that school officials may constitutionally regulate, each of which is governed by different Supreme Court precedent: (1) vulgar, lewd, obscene and plainly offensive speech is governed by *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); (2) school-sponsored speech is governed by *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988); and (3) speech that falls into neither of these categories is governed by *Tinker*.[3] The parties agree Plaintiffs' speech falls into the third category and is governed by the standards set forth in *Tinker*.

The Supreme Court in *Tinker* held that a school district violated the First Amendment rights of students when it suspended them for wearing black armbands in protest of the Vietnam War. 393 U.S. at 513. The Court determined school officials could not restrain students' speech without showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id*. at 514. Because the *Tinker* plaintiffs' speech "was a silent, passive expression of opinion, unaccompanied by any disorder or disturbance" that "neither interrupted school activities nor sought to intrude in the school affairs or the lives of

---

[3] In *Morse v. Frederick*, 551 U.S. 393, 403 (2007), the Supreme Court held that a school may also restrict "student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use."

others," the Supreme Court held that the First Amendment prohibited school officials from denying plaintiffs' expression. *Id*. at 508, 514. In so holding, the *Tinker* Court explained that "where there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained." *Id*. at 509 (internal quotation marks and citation omitted).

"*Tinker's* test for determining whether the First Amendment protects 'third category' student speech examines only the *effect* of the speech on school activities and the rights of others." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006) (emphasis in original) (citing *LaVine*, 257 F.3d at 989-92; *Chandler*, 978 F.2d at 529-30; and *Karp v. Becken*, 477 F.2d 171, 176 (9th Cir. 1973)). Thus, there is no public concern requirement in the context of student speech.[4] Instead, the First Amendment protects "all student speech that is neither school-sponsored, a true threat nor vulgar, lewd, obscene or plainly offensive unless school officials show 'facts which might

---

[4] In the context of First Amendment claims raised by government employees, a court evaluating restraints on a public employee's speech must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ*., 391 U.S. 563, 568 (1968). To merit the *Pickering* balancing test, a public employee's speech must touch on a matter of "public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983). A public employer may be prohibited under the First Amendment from suppressing employee speech which involves a matter of public concern, but may constitutionally suppress employee speech addressing "matters only of personal interest." *Id*. at 147. Both the Supreme Court and the Ninth Circuit have held the public concern requirement is inapplicable in student speech cases. *Hazelwood*, 484 U.S. at 266 (public school students "cannot be punished merely for expressing their personal views on the school premises . . . unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'") (quoting *Tinker*, 393 U.S. at 509); *Pinard*, 467 F.3d at 767 ("In short, we do not read *Tinker*, its progeny or our own cases applying its standard as importing *Connick's* public concern test into the public education context[.]").

reasonably have led [them] to forecast substantial disruption of or material interference with school activities.'" *Pinard*, 467 F.3d at 767 (brackets in original) (quoting *Chandler*, 978 F.2d at 529).

As mentioned, Plaintiffs bring two claims for First Amendment retaliation under 42 U.S.C. § 1983. To establish First Amendment retaliation claims under 42 U.S.C. § 1983, Plaintiffs must show: (1) they were engaged in a constitutionally protected activity; (2) the Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motiving factor in the Defendants' conduct. *Pinard*, 467 F.3d at 770. If Plaintiffs establish the elements of a retaliation claim, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001).

## 1. The Sit-In

A school can regulate student speech if such speech "materially and substantially disrupt[s] the work and discipline of the school." *Tinker*, 393 U.S. at 513. "This standard does not require that the school authorities wait until an actual disruption occurs; where school authorities 'can reasonably portend disruption' in light of the facts presented to them in the particular situation, regulation of student expression is permissible." *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1110 (9th Cir. 2010) (quoting *Tinker*, 393 U.S. at 514). Although actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance"

to overcome a student's right to freedom of speech. *Tinker*, 393 U.S. at 508. Thus, a decision to discipline speech must be supported "by the existence of *specific facts* that could reasonably lead school officials to forecast disruption." *J.C. ex rel. R.C.*, 711 F. Supp. 2d at 1111 (emphasis in original). Further, school officials must show that the regulation of student speech was caused by something more than "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. As the *Tinker* Court explained: "Any word spoken in a class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." 393 U.S. at 509 (citing *Terminiello v. Chicago*, 337 U.S. 1 (1949)).

Defendants argue the sit-in cannot be considered constitutionally protected speech because the undisputed facts establish the sit-in substantially disrupted the cheerleading practice that was being conducted at the time of the protest.[5] In support of their claim that the sit-in caused actual disruption, Defendants note Plaintiffs refused to participate in practice and did not wear their appropriate practice uniform. Dkt. 25-1, at 5. However, disruption must "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," for a prohibition on speech to be sustained. *Tinker*, 393 U.S. at 509 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). There is no evidence Plaintiffs' failure to participate in practice or to wear

---

[5] Although the sit-in occurred during an early morning practice before school had started, Defendants note before and after school practices were considered part of Plaintiffs' cheerleading class, and that Plaintiffs received credit and a grade for their cheerleading class. Dkt. 25-1, at 4.

their uniforms materially interfered with discipline in the operation of the school, or, given the short duration of the sit-in, with the appropriate discipline of the cheerleading class.

Athletic Director Kerbs also stated he and Wray "had quite a conversation with A.M. to finally get [Plaintiffs] to leave" the gym. Dkt. 25-5, Ex. F, at 19:9-10. That A.M. may have argued with Kerbs and Wray when ordered to leave the gym also does not establish substantial disruption for purposes of summary judgment. As the Supreme Court emphasized in *Tinker*, "vigilant protection of constitutional freedom is nowhere more vital than in the community of American schools. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues,' (rather) than through any kind of authoritative selection." 393 U.S. 513 (citations omitted). Clearly, students may disagree with their teachers or administrators without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. *Id*. Contrary to Defendants' contention, A.M.'s argument with Kerbs and Wray does not establish the sit-in substantially disrupted the educational process for purposes of summary judgment.

Finally, Defendants contend they are entitled to summary judgment on Claim One because two of the Plaintiffs, Z.M. and I.M., testified in their depositions that "it would have been difficult to hold a practice without their participation, and that the rest of the cheerleaders could not effectively practice without them." Dkt. 25-1, at 6. However, Z.M.

clarified the non-protesting cheerleaders "could have practiced. We left before the bell even rang to go to class." Dkt. 25-5, Ex. J, at 17:2-3. When questioned whether the non-protesting cheerleaders had "some difficulty really doing the practice when half the team [wasn't] participating," another Plaintiff, C.S., stated, "[t]hey had to change formations, but that happens all the time with cheer." Dkt. 25-6, Ex. M, 11:3-6. C.S. also testified the non-protesting cheerleaders could practice without Plaintiffs' participation because "they did other routines throughout the year without us." *Id*. at 7-11. In light of such testimony, even if the fact practice may have been ineffective for a few minutes could establish substantial disruption under *Tinker*, it is disputed whether practice was actually ineffective. Thus, the testimony Defendants cite is not sufficient to establish the sit-in caused a substantial disruption as a matter of law.

In addition to actual disruption, Defendants suggest BHS administration "reasonably concluded that the sit-in would disrupt the educational process." Dkt. 25-1, at 6. The only specific fact Defendants allege to support their claim the sit-in could reasonably lead to substantial disruption is the deposition testimony of Assistant Principal Wray, who stated that the protest was potentially "very unsafe" because the non-protesting cheerleaders were distracted by the sit-in, and the coaches were distracted by attempting to supervise both the non-protesting cheerleaders and those engaging in the sit-in. Dkt. 25-4, Ex. D, at 16:15-17:16, 23:17-24:10. But Wray's testimony is not clear as to why the non-participating cheerleaders' distraction was necessarily unsafe. For instance, Wray testified "[p]art of the cheer class is meant for training and learning cheer routines, some of which require stunting or tumbling which has the girls doing flips or

other routines. If someone is not paying attention or if someone is not fully engaged in what is going on, an injury could result." *Id*. at 23:24-24:5. However, Wray did not testify that the non-protesting cheerleaders were actually tumbling or "doing flips," at the time of the sit-in, and were thus unsafe as a result of their distraction. Nor do Defendants offer any other evidence, such as testimony from Mansfield, the non-protesting cheerleaders, or any other BHS administrator, to suggest the non-protesting cheerleaders' distraction was in any way unsafe.

Defendants note school officials have a duty to prevent disturbances, including providing an educational environment free from distractions. Dkt. 25-1, at 4 (citing *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007)). However, Defendants appear to presume that because the sit-in occurred during cheerleading class, the protest substantially disrupted the educational process. *Id*. at 6 (stating "[s]ince the Plaintiffs' practices are all considered part of their cheerleading class, they disrupted the educational process.") The law does not so hold. As the Supreme Court stated in *Tinker*, regardless of whether a student is in the classroom, the cafeteria, the playing field, or simply on campus during authorized hours, she "may express [her] opinions, even on controversial subjects. . . if [s]he does so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." 393 U.S. at 513 (internal quotation marks and citation omitted); *see also Hazelwood*, 484 U.S. at 266 (public school students "cannot be punished merely for expressing their personal views on the school premises[.]")

Interpreting the facts in the light most favorable to Plaintiffs, the record shows that the Plaintiffs missed one cheer class, and that cheer practice was temporarily interrupted by the sit-in. Temporary interruption of class time does not, standing alone, establish material and substantial disruption. *See, e.g.*, *J.C. ex rel. R.C.*, 711 F. Supp. 2d at 1117 (disruption was "entirely too *de minimis* as a matter of law" where although five students were pulled out of classes for a morning, school officials had to investigate a video created by one student and distributed to several other students, and the school had to address concerns of an upset student and parent, there was no evidence that the video "had any ripple effects on class activities or the work of the school."); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 929 (3d Cir. 2011) (the inconvenience associated with the student expression at issue, including the principal's meetings related to it, "general rumblings," students talking in class for a few minutes, and some school officials rearranging their schedules to assist the principal did not rise to a substantial disruption); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 704 (W.D. Pa. 2003) ("While [the school principal] believes that he can discipline a student for bringing 'disrespect, negative publicity, [and] negative attention to our school and to our volleyball team,' this is simply not sufficient to rise to the level of 'substantial disruption' under *Tinker*.").

Defendants also contend another factor relevant to the substantial disruption inquiry is "whether school administrators are pulled away from their ordinary tasks to respond to or mitigate the effects of a student's speech." *Id*. (citing *J.C. ex rel. R.C.*, 711 F.Supp.2d at 1113-14). Defendants imply the educational process was disrupted because

Kerbs and Wray had to leave their offices to go to the gym to deal with Plaintiffs. However, Defendants have not shown that the actions Kerbs and Wray took to end the sit-in were outside the realm of ordinary school activities. Instead, the record suggests Kerbs and Wray took steps to investigate the nature of the sit-in and to remove Plaintiffs from the gym. As the Ninth Circuit held in *J.C. ex rel. R.C.*, "[t]hat is what school administrators do. As long as students have attended school, some get sent to the principal's office for discipline, some seek counseling from the school counselors, and upset parents on occasion voice concerns to the school[.]" 711 F. Supp. 2d at 1118-1119. That Wray and Kerbs briefly left their offices to respond to the sit-in and discipline Plaintiffs does not establish substantial disruption for purposes of summary judgment.

Finally, Plaintiffs dispute Defendants' contention that the sit-in was actually or potentially disruptive. Dkt. 29, at 4-5 (citing Dkt. 29-3, Ex. 2, at 3-14). Each Plaintiff described the sit-in as peaceful and brief. For instance, Plaintiff A.G. stated:

> The morning of the sit-in, the girls who participated in the sit-in and I sat on the gym bleachers as the other cheerleaders practiced on the gym floor. We sat on the bleachers and quietly whispered to one another wondering what was going to happen. The athletic director, Gordy Kerbs, and the BHS administrators came into the gym and told us we could not be there. [A.M.] stated that we were protesting and that the student handbook gave us that right. [Mr. Kerbs] told us we can be punished for insubordination and we were led to the library where we were told to call our parents.

Dkt. 29-3, Ex. 2, at 3-4.

When describing the sit-in, Plaintiff A.M. noted, we "sat down on the floor bleachers and didn't say anything or laugh. We maintained a very serious demeanor." *Id*. at 4. Plaintiff Z.M. summarized the sit-in as follows:

We walked in quietly and sat down on the west bottom part of the bleachers. . . . [Mansfield] did not talk to any cheerleader participating in the sit in at all. . . . Kerbs, the athletic advisor, was the first one to come in and talked to us. He was mad at us girls for doing this. . . . Wray, one of the vice principals, came in the gym and talked to us. I really can't remember what he said. . . but the one thing I can remember is him telling us that we can't sit there so he told us that we had to follow him. . . . He took us to the computer lab in the library and then I believe Wray told us girls something along the lines of, "[you are] going to get suspended and kicked off the team."

*Id*. at 5-6.

Plaintiff D.O. explained, "[a]s we walked into the gym nothing was said—no rude comments or anything. We all took a seat, and nothing was said until the two Vice Principals came in, and also the Athletic Director. They asked us what we were doing and we calmly answered. In my point of view it was not disrespectful in any way. We just quietly sat there." *Id*. at 8. Plaintiff S.S. stated: "We walked in, didn't say a word, and sat down on the bleachers." *Id*. at 11.

With respect to A.M., the student who purportedly argued with Kerbs, Plaintiff I.M. stated, "one of our girls [A.M.] pulled out the Student Handbook and started to read from it. Our school Administrators/Teachers refused to listen and ordered us down to the Media Center located in a small room in the back of the library." *Id*. at 7. Plaintiff V.R. noted A.M. read BHS administrators "some of our rights that she had printed out from the student handbook, and they continued to ignore us and tell us we had to leave with them. We then got up and followed them through the school to the computer lab in the back of the library. We asked a few questions regarding why we had to leave, and they wouldn't answer us." *Id*. at 9.

As the Ninth Circuit has stated, the "substantial disruption inquiry is highly fact-intensive. Perhaps for that reason, existing case law has not provided clear guidelines as to when a substantial disruption is reasonably foreseeable." *J.C. ex. rel. R.C.*, 711 F. Supp. 2d at 1111. "There is, for example, no magic number of students or classrooms that must be affected by the speech." *Id*. However, *Tinker* establishes that a material and substantial disruption is one that affects "the work of the school" or "school activities" in general. *Tinker*, 393 U.S. at 509. In *Tinker*, the evidence showed armbands students wore to protest the Vietnam War caused other students to make comments, to poke fun at the students wearing the armbands, and caused one student to feel "self-conscious." 393 U.S. at 518. One math teacher also testified his classroom was temporarily "wrecked" by disputes with a student wearing an armband. *Id*. at 517 (Black, J. dissenting). Nonetheless, the majority concluded the students wearing armbands "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others." *Id*. at 514.

Thus, while Defendants have presented some facts to suggest the sit-in actually or foreseeably disrupted the educational process, the record on summary judgment does not present a disruption of sufficient magnitude to satisfy *Tinker*. Nor, as described above, is Defendants' characterization of the purported disruption undisputed.[6] Because Defendants have not established the sit-in caused a substantial disruption to school

---

[6] Moreover, as Plaintiffs note, the facts also suggest Wray and Kerbs' response to the sit-in exacerbated, rather than contained, any disruption to the cheerleading class. Dkt. 29, at 5. The record on summary judgment suggests that, absent Wray and Kerbs' actions, the cheer practice could have continued without disruption despite the sit-in.

activity as a matter of law, and have not offered sufficient facts to allow the Court to determine whether their fear that substantial disruption was likely to occur was reasonable, summary judgment with respect to Claim One is inappropriate.[7] *Tinker*, 393 U.S. at 514 (the school bears the burden of demonstrating sufficient facts to support its forecast of substantial disruption.)

### 2. Plaintiffs' reservation of rights

Defendants concede that the Plaintiffs' reservation of rights to use the school district's grievance process was protected under the First Amendment. Dkt. 25-1, at 6. As such, Defendants do not suggest Plaintiffs' reservation of rights actually or potentially disrupted school activities. Defendants instead contend Plaintiffs cannot meet the second and third elements of a First Amendment retaliation claim with respect to Claim Two.

### a. Chilling effect of Defendants' actions

The second element of a First Amendment retaliation claim requires Plaintiffs to establish the Defendants' actions in dismissing them from the cheerleading team would chill a person of ordinary firmness from continuing to engage in constitutionally protected activity. *Pinard*, 467 F.3d at 770. Defendants argue Plaintiffs cannot satisfy this element because they engaged in the school district's grievance process both prior to and after being dismissed from the cheerleading team. Defendants maintain Plaintiffs' First Amendment retaliation claim fails "because at no point were the Plaintiffs chilled from engaging in the District's grievance process." Dkt. 25-1, at 7.

---

[7] In their Motion for Summary Judgment, Defendants do not challenge the second two elements of Plaintiffs' First Amendment retaliation claim with respect to the sit-in.

Defendants misinterpret the law—a plaintiff is not required to have actually been chilled by a defendant's actions in order to state a retaliation claim. Instead, the "test is generic and objective. Whether [plaintiff] was, or would have been, chilled is not the test." *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016). "Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity. . . the proper inquiry asks 'whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Mendocino Env'l Ctr v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996)).

Significantly, the Ninth Circuit has previously held that suspension from extra-curricular activities would chill a person of ordinary firmness from continuing to engage in protected activity. *Pinard*, 467 F.3d at 771. As in this case, plaintiffs in *Pinard* were suspended from a sports team for protesting an abusive coach. The *Pinard* Court held:

> The petition and complaints against [the coach] were constitutionally protected, and the defendants' suspension of the plaintiffs would lead ordinary student athletes in the plaintiffs' position to refrain from complaining about an abusive coach in order to remain on the team. Thus, if the plaintiffs can show that their protected speech was a 'substantial or motivating factor' in the defendants' decision to suspend them from the team permanently, and the defendants fail to show that they 'would have taken the same action even in the absence' of that speech, then the defendants violated the plaintiffs' First Amendment rights.

*Id.*

Defendants do not offer any evidence or argument other than their contention that Plaintiffs were "never refrained from engaging in and continuing to engage in the

District's grievance process," to dispute the second element of Plaintiffs' First Amendment retaliation claim. Dkt. 28, at 5. Defendants cannot escape liability for retaliation simply because Plaintiffs persisted in the constitutionally protected activity of grieving their punishment. *Mendocino*, 192 F.3d at 1300. Nor do Defendants offer any relevant facts to distinguish this case from the situation faced by the student athletes in *Pinard*. The Court accordingly finds Defendants' dismissal of Plaintiffs from the cheerleading team would lead ordinary student athletes in Plaintiffs' position to refrain from engaging in the grievance process in order to stay on the cheer team.

### b. Substantial or motivating factor for Plaintiffs' dismissal

Defendants argue Plaintiffs cannot establish the third element of a First Amendment retaliation claim because Plaintiffs' reservation of rights to use the district's grievance process was not a substantial or motivating factor in Defendants' decision to dismiss Plaintiffs from the cheerleading team. Dkt. 25-1, at 7 (citing *Pinard*, 467 F.3d at 770). In support of this contention, Defendants note Superintendent Smyer, Assistant Superintendent Miller and BHS Principal Levi Power ("Principal Power") each testified in their depositions that Plaintiffs were not removed from the cheerleading team because they reserved their right to take advantage of the district's grievance process.

For instance, when asked, "[d]id you revoke the membership of the twelve cheerleaders that were kicked off the team, because they had expressed that they wanted to file a grievance?" Superintendent Smyer responded:

> No. That wasn't the issue at all. They brought back the stipulations – they had qualified their stipulations, and we were looking for an unqualified

acceptance of the stipulation. The grievance letter was just indicative of –
that they were still not accepting of the expectations that were set forth.

Dkt. 25-3, Ex. A, at 16:4-14. Assistant Superintendent Miller similarly stated: "It is my

testimony that I believe [Plaintiffs] were dismissed from the cheer team not because they

asked to be able to grieve but because they chose not to complete the stipulations that

were set forth here without some continued conflict. They—there was still conflict, in my

mind; and it was not going to be resolved." Dkt. 25-3, Ex. B, at 31:11-17. Principal

Power also confirmed he determined Plaintiffs needed to be dismissed from the

cheerleading team "[b]ecause they clearly weren't in agreeance [sic] with the stipulations

that we – that were set out." Dkt. 25-3, Ex. C, at 28:19-24.

With such testimony, Defendants attempt to establish the motivating factor for

Plaintiffs' dismissal was Plaintiffs' disagreement with the stipulations, and not Plaintiffs'

constitutionally protected reservation of rights. There are two problems with this

argument. First, Plaintiffs and their parents signed the stipulation letter and returned it to

BHS administration within the time period specified for doing so. The stipulation letter

specifically stated that in order to rejoin the cheer team, Plaintiffs would need to

complete each of the punishments outlined therein, as well as to follow the cheer

handbook, maintain a positive attitude and work ethic, and avoid any negative texts or

social media posts about any member of the cheer squad, cheer coaching staff or BHS.

Dkt. 25-8, Ex. S. Plaintiffs demonstrated they would comply with these conditions—

regardless of whether or not they agreed with them—by signing and returning the

stipulation letter.[8]

Second, and more importantly, Defendants' subjective interpretation of Plaintiffs' motivation for reserving their constitutional rights to grieve the district's decision is not distinguishable from the reservation of rights itself. Defendants attempt to argue that the substantial or motivating factor for dismissing Plaintiffs was not that Plaintiffs reserved their rights to grieve the district's decision, but that the reservation of rights indicated Plaintiffs did not agree with their punishment and would continue to cause disunity within the team. The only support for this conclusion, however, is the fact that Plaintiffs reserved their rights to grieve the district's decision. Thus, although Defendants admit they could not constitutionally dismiss Plaintiffs from the team for reserving their grievance rights, they suggest they could constitutionally dismiss Plaintiffs for the symbolic message Plaintiffs' reservation of rights purportedly expressed. *Tinker* expressly prohibits school officials from punishing students for such "silent, passive expression of opinion[.]" 393 U.S. at 508. Further, Defendants' argument that Plaintiffs' "desire to grieve was not the root cause of the Plaintiffs' dismissal from the team," and that Plaintiffs were "dismissed because of their actions" is hollow when Defendants do not identify any actions Plaintiffs took apart from the constitutionally protected conduct

---

[8] Defendants note one "Plaintiff [A.G.] even testified in her deposition that she would not have completed one of the stipulations even if allowed back on the team, and that even though she had signed the stipulations, she wouldn't have followed through with apologizing to the team and coaches." Dkt. 28, at 9 (citing Dkt. 25-5, Ex. G, at 21:16-22:20). That one plaintiff may not have complied with the stipulations once she was back on the team is irrelevant where Defendants never allowed her to rejoin the team in the first place. A.G.'s testimony of what she would or would not have done if she had hypothetically been let back on the team does not provide a constitutional basis for Defendants' decision to dismiss her—or the eight other Plaintiffs—from the cheerleading team.

of reserving their rights to engage in the grievance process. Dkt. 25-1, at 8.

Moreover, Superintendent Smyer's dismissal letter to Plaintiffs specifically states Plaintiffs' reservation of rights "is interpreted to be a desire to utilize the grievance process as opposed to the solution propounded by the administration." Dkt. 25-8, Ex. T, at 2. Plaintiffs did not express such intentions, but Defendants could not lawfully punish Plaintiffs for such intentions even if they had. Fundamental to the First Amendment is the idea that "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Tinker*, 393 U.S. at 511. Defendants do not argue Plaintiffs' purported disagreement with the stipulations would cause material and substantial interference with schoolwork or discipline. Thus, Defendants could not constitutionally dismiss Plaintiffs from the cheerleading team simply because Plaintiffs expressed they were dissatisfied with Defendants' decision. As the Supreme Court has stated, the "enduring lesson" of First Amendment law is "that the government may not prohibit expression simply because it disagrees with its message[.]" *Texas v. Johnson*, 491 U.S. 397, 416 (1989).

Defendants also cite a number of alternative reasons Plaintiffs were purportedly dismissed from the cheer team, including "violations of the Plaintiffs' Cheer Handbook, Cheer Constitution and Athletic Code, which actions included the Plaintiffs disrupting and missing practice on the day of the sit-in, not giving 100% during a practice, creating disunity amongst the cheerleading team and their insubordination towards their coach and the high school administrators." Dkt. 28, at 8. However, Defendants allowed two

cheerleaders who had participated in the sit-in, and who had thus engaged in each of the aforementioned cheer code violations Plaintiffs committed—but who did not reserve their rights to grieve the school's decision—back on the cheerleading team. The only distinction between the cheerleaders who were allowed back on the team and Plaintiffs was that, unlike the two protesting cheerleaders who were allowed to rejoin the squad, Plaintiffs reserved their rights to utilize the school district's grievance process.[9] Consequently, Defendants cannot establish that cheer code violations, as opposed to Plaintiffs' constitutionally protected reservation of rights, were the substantial or motivating factor for their decision to dismiss Plaintiffs from the cheer team.

### c. Whether Defendants would have dismissed Plaintiffs in the absence of their reservation of rights

Where, as here, Plaintiffs have established the three elements of a First Amendment retaliation claim, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001) (quoting *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996)). To make this showing, Defendants

---

[9] Defendants suggest the two girls who did not reserve their rights were allowed back on the team "because they showed an apologetic attitude, and indicated that they genuinely wanted to be back on the team and reconnect with the remaining members." Dkt. 28, at 9-10. Although it is not clear from the record how the two cheerleaders showed they were apologetic and wanted to reconnect with the team, Superintendent Smyer made clear in his deposition that he believed they did so because they did not reserve their rights to engage in the grievance process. When questioned, "just so I understand it, the cheerleaders that did not submit the [reservation letter] were allowed back on the team?" Superintendent Smyer responded: "Yeah. My interpretation was, when they signed this and brought it back without any attachment, that they were accepting the expectations set forth and were going to comply with it." Dkt. 25-3, Ex. A, at 52:23-53:5. Superintendent Smyer also unequivocally stated if Plaintiffs "had returned [the October 5, 2017 stipulations] without qualification and complied with the expectations set forth, they were back on. It is my understanding that, I think, two of them did just that." *Id*. at 52:7-10.

again argue they did not punish Plaintiffs for reserving their grievance rights, but instead dismissed Plaintiffs from the cheerleading team for "disrupting and missing practice the day of the sit-in, not giving 100% during a practice, creating disunity amongst the cheerleading team, and their insubordination towards their coach and the high school administrators." Dkt. 28, at 11.

In *Pinard*, the Ninth Circuit held that to avoid liability for retaliation, defendants must show more than that they "*could* have" punished the plaintiffs in the absence of the protected speech, instead, "the burden is on the defendants to show through evidence that they *would* have punished the plaintiffs under those circumstances." 467 F.3d at 770 (emphasis in original) (quoting *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 512 (9th Cir. 2004)). Defendants cannot make this showing as a matter of law. Although Defendants *could* have dismissed Plaintiffs for the aforementioned cheer code violations, the undisputed evidence establishes Defendants did not dismiss the two cheerleaders who had also committed each of these violations. Instead, Defendants allowed the two cheerleaders who had broken the cheer code and participated in the sit-in, but who did not reserve their rights to grieve the school district's decision, back on the cheerleading team. As such, Defendants cannot satisfy their burden of establishing they would have taken the same action of dismissing Plaintiffs even in the absence of Plaintiffs' protected reservation of rights. *Id.*

### d. Personal participation

Defendants argue Plaintiffs fail to adequately allege personal participation by individual defendants Superintendent Smyer, Assistant Superintendent Miller, and

Principal Power (collectively referred to hereinafter as "Individual Defendants") in the decision to punish Plaintiffs for the sit-in and to ultimately dismiss Plaintiffs from the team. Defendants suggest dismissal against the Individual Defendants is appropriate because in section 1983 actions, "each government official, his or her title notwithstanding, is only liable for his or her own misconduct." Dkt. 25-1, at 11 (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). Defendants contend absent proof that "Superintendent Smyer, Assistant Superintendent Miller and Principal Power each retaliated against the Plaintiffs for exercising their First Amendment rights, the Individual Defendants cannot be liable." *Id*.

Plaintiffs' Complaint named all three Individual Defendants in both Claim One and Claim Two. During oral argument, Plaintiffs' counsel conceded Superintendent Smyer and Assistant Superintendent Miller were not involved in the decision to punish Plaintiffs for the sit-in, and clarified that Plaintiffs are no longer pursuing Smyer and Miller with respect to Claim One. Superintendent Smyer and Assistant Superintendent Miller are accordingly dismissed from this action with respect to Claim One, and Principal Power is the only remaining Individual Defendant Plaintiffs allege retaliated against them for engaging in the sit-in.

Summary judgment in favor of Principal Power on Claim One is inappropriate. Although, as Defendants note, Principal Power was not at school the day of the sit-in, the Complaint alleges Principal Power gave each plaintiff the written notice of their one-week suspension, and, on October 5, 2017, his office gave each plaintiff a list of additional punishments to which Plaintiffs and their parents were required to agree to be

let back on the cheerleading team. Dkt. 1, at ¶¶ 50-51. Principal Power testified in his deposition that he drafted the October 5, 2017, suspension letter with the list of stipulated requirements for Plaintiffs to re-join the cheerleading team. Dkt. 29-4, Ex. 4, at 40:2-14; 47:1-7. Principal Power confirmed that he agreed with each of the stipulations included in the October 5, 2017, letter. *Id*. at 40:23-42:18. As Plaintiffs note, Principal Power "not only conveyed the notice to add the punishment set forth in the October 5th Stipulations, he individually participated in imposing those punishments on Plaintiffs." Dkt. 29, at 13-14 (citing Dkt. 29-4, Ex. 4, at 39:15-46:9). Such facts illustrate Principal Power's personal participation in Defendants' purported First Amendment retaliation against Plaintiffs for the sit-in. Thus, the Court denies summary judgment in favor of Principal Power on Claim One.

With respect to Claim Two, Plaintiffs have established the Individual Defendants personally participated in dismissing Plaintiffs from the cheerleading team in violation of Plaintiffs' First Amendment rights. Plaintiffs alleged in their Complaint that Superintendent Smyer, Assistant Superintendent Miller and Principal Power "in their individual capacity and as the final decision-making authority on behalf of BHS and the School District" made the decision to dismiss Plaintiffs from the cheer team after receiving Plaintiffs' reservation of rights. Dkt. 1, ¶ 71. The undisputed facts support this allegation.

Superintendent Smyer testified that he wrote the letter dismissing Plaintiffs from the team, clarified that he decided Plaintiffs should be dismissed from the cheer team after receiving their reservation of rights, and stated the school district's policy gave him

the authority to make this decision. Dkt. 26-7, Ex. 3, at 11:3-13; 51:11-21; 54:9-22.

Superintendent Smyer also noted he made the decision to dismiss Plaintiffs after meeting

with Assistant Superintendent Miller and Principal Power, as well as with other members

of the administration and school board. *Id*. at 13:22-14:16. Although the school district's

counsel assisted Superintendent Smyer with some of the language in the dismissal letter,

Smyer confirmed he was responsible for writing the letter. *Id*. at 15:1-5.

Assistant Superintendent Miller testified that she participated in the October 6,

2017, meeting when the decision to dismiss Plaintiffs was made, that her signature was

on the October 7, 2017, letter dismissing Plaintiffs, and that she was one of the decision-

makers in deciding to kick the girls off of the cheerleading team. Dkt. 26-12, Ex. 7, at

17:1-15; 18:10-15. Principal Power testified he recommended the girls who had

submitted the reservation letter "needed to be dismissed from the squad." Dkt. 26-10, Ex.

5, at 28:11-20. He noted he had "a lot of discussions" with Superintendent Smyer

regarding the decision to kick the girls off the team. *Id*. at 26:5-12. Principal Power also

confirmed he supported Superintendent Smyer's decision to terminate Plaintiffs' team

membership because "essentially they didn't agree to the stipulations laid out on October

5th." *Id*. at 84:7-14.

Plaintiffs have alleged and proved Superintendent Smyer, Assistant

Superintendent Miller, and Principal Power together made the decision to dismiss

Plaintiffs from the cheer team for expressing their desire to continue to engage in the

district's grievance process. Because such expression was protected under the First

Amendment and was the substantial and motivating factor for Plaintiffs' dismissal, and

because dismissal from the cheer team would chill a person of ordinary firmness from engaging in protected activity, Plaintiffs have established that the Individual Defendants, through their own individual actions, violated the Constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

### e. Qualified Immunity

Finally, Defendants seek summary dismissal of Plaintiffs' claims against the Individual Defendants on the basis of qualified immunity. Qualified immunity shields public officials sued in their individual capacity from monetary damages, unless their conduct violates clearly established law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (officials should be shielded from damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.")

Determining whether officials are protected by qualified immunity involves two inquiries: (1) whether the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established at the time of the constitutional violation. *O'Brien*, 818 F.3d at 936. Given the disputed facts regarding whether the sit-in was protected under the First Amendment, the Court cannot make a qualified immunity determination with respect to Claim One on summary judgment. However, for the reasons discussed above, Plaintiffs have shown Defendants retaliated against them in violation of their First Amendment rights and thus meet the first prong of the qualified immunity analysis with respect to Claim Two.

The second prong of the qualified immunity analysis requires the Court to determine whether the right, defined according to the actual facts of the case, was clearly established at the time of the constitutional violation. *Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006). "A right is 'clearly established' for purposes of qualified immunity when its contours are sufficiently clear that reasonable officials would know their actions violated that right." *J.C. ex rel. RC*, 711 F.Supp.2d at 1124 (quoting *Layshock v. Hermitage Sch. Dist.*, 496 F. Supp. 2d 587, 603 (W.D. Pa. 2007)). To determine whether a law is clearly established, the court "survey[s] the legal landscape" and examines those cases that are "most like" the present case. *Id*. (quoting *Trevino v. Gates*, 99 F.3d 911, 916-17 (9th Cir. 1996)). In the Ninth Circuit, "specific binding precedent is not required to show that a right is clearly established for purposes of the qualified immunity analysis." *Id*. at 1125 (internal citations omitted). "In the absence of binding precedent, district courts should look to 'all available decisional law including the decisions of state courts, other circuits, and district courts to determine whether the right was clearly established.'" *Id*. (quoting *Maraziti v. First Interstate Bank of Calif.*, 953 F.2d 520, 525 (9th Cir. 1992)).

Defendants suggest "there is no controlling authority indicating that when a student disrupts a cheerleading practice/class, and then shows a continued threat of disruption, that her First Amendment right will be violated when she is dismissed from the cheerleading team." Dkt. 25-1, at 18. In framing the inquiry, Defendants misstate the facts since Defendants have not claimed or established Plaintiffs showed a continued threat of disruption by reserving their rights to engage in the grievance process. Instead,

Defendants admit Plaintiffs' reservation of rights was constitutionally protected

activity.[10] Dkt. 25-1, at 6. Nor is such an extreme level of specificity required in order to

defeat a qualified immunity defense. Where the specific factual scenario of a given case

has not been previously litigated and decided, "the court may nonetheless find clearly

established law if 'a general constitutional rule already identified in the decisional law

[applies] with obvious clarity to the specific conduct in question.'" *J.C. ex rel. RC*, 711 F.

Supp. 2d at 1125 (brackets in original) (quoting *United States v. Lanier*, 520 U.S. 259,

271 (1997)).

At oral argument, Defendants relied heavily on *Lowery v. Euverard*, 497 F.3d 584,

587 (6th Cir. 2007) to argue the Individual Defendants' actions were objectively

reasonable because they dismissed Plaintiffs based on a perceived threat to team unity

and morale. However, in *Lowery*, the Sixth Circuit held the speech at issue was *not*

constitutionally protected. Plaintiff football players in *Lowery* signed a petition stating

they hated their football coach and didn't want to play for him. 497 F.3d at 586. The

Court held it was reasonable for defendant school officials to forecast the petition would

substantially disrupt the team. *Id*. at 593. Because the petition was not protected by

*Tinker*, the *Lowery* Court held defendants did not violate plaintiffs' First Amendment

---

[10] As Defendants highlight with respect to the sit-in, if the reservation of rights reasonably led Defendants to foresee substantial disruption of school activities, the reservation would not be constitutionally protected under *Tinker*. 393 U.S. at 513. Defendants do not argue Plaintiffs' reservation of rights actually or potentially disrupted the educational process. Defendants do suggest Plaintiffs' reservation of rights indicated "further conflict that could reasonably be concluded to lead to continued disruption of team unity." Dkt. 25-1, at 16. The Court has rejected this contention, as, absent any other conduct by Plaintiffs, the message Plaintiffs' reservation of rights purportedly expressed cannot provide a legitimate basis for dismissing Plaintiffs from the cheerleading team independent from the constitutionally protected reservation of rights. *See supra*, section IV.b.

rights by removing them from the football team. *Id*. at 596. In light of such holding, the *Lowery* Court did not need to address the second prong of the qualified immunity analysis.

Although the cases are factually similar, the qualified immunity inquiry is distinguishable because the Court and the parties agree Plaintiffs' reservation of rights was constitutionally protected. Because, as discussed above, Plaintiffs' dismissal was substantially motivated by such constitutionally protected expression, Defendants retaliated against Plaintiffs in violation of the First Amendment rights. With the first prong of the qualified immunity analysis met, the Court must consider whether a reasonable school official in the Individual Defendants' shoes would have known that taking disciplinary action against Plaintiffs in retaliation for reserving their grievance rights violated the First Amendment.

"Retaliation for engaging in protected speech has long been prohibited by the First Amendment." *O'Brien*, 818 F.3d at 936 (finding a reasonable official in school administrators' shoes would have known that taking disciplinary action against a student, when such action was substantially motivated by student's expression of his views, violated his First Amendment rights). This principle has also been clearly applied in the school sports setting. *Pinard*, 467 F.3d at 770; *see also Seamons v. Snow*, 206 F.3d 1021, 1030-31 (10th Cir. 2000) (football coach was not entitled to qualified immunity because "coaches may not penalize players for engaging in peaceful speech activity which does not create substantial disorder, materially disrupt class work, or invade the rights of others"); *Boyd v. Board of Directors of McGhee Sch. Dist*., 612 F. Supp. 86, 93 (E.D.

Ark. 1985) (high school football coach held liable to black football players for depriving them of the First Amendment rights by suspending them from football team for remainder of season after players walked out of pep rally and boycotted scheduled game in protest of racial inequality); *Williams v. Eaton*, 443 F.2d 422 (10th Cir. 1971) (finding plaintiff football players stated claim for First Amendment retaliation against football coach who dismissed them from the football team for wearing armbands in peaceful and symbolic protest of racial discrimination).

Where, as here, Defendants do not establish, or even suggest, that Plaintiffs' reservation of rights created substantial disorder, materially disrupted class work, or invaded the rights of others, a reasonable school official in the Individual Defendants' shoes would have known that taking disciplinary action against Plaintiffs for reserving their rights violated the First Amendment.[11] As such, the Individual Defendants are not entitled to qualified immunity on Claim Two.

---

[11] In their Motion for Summary Judgment, Defendants contend Plaintiffs must prove the Individual Defendants were aware their actions violated the law, and argue the Individual Defendants did not dismiss Plaintiffs from the cheerleading team with the intention of violating Plaintiffs' First Amendment rights. Dkt. 25-1, at 15-18. The Individual Defendants' subjective intentions in dismissing Plaintiffs from the team are irrelevant. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). While the qualified immunity analysis used to have both an objective and subjective component, *Wood v. Strickland*, 420 U.S. 308, 322 (1975), the Supreme Court abolished the subjective prong in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Harlow*, the Court observed the subjective element of the qualified immunity standard created disputed questions of fact concerning the defendant's good faith that could not be resolved on summary judgment. *Id*. at 816. In addition to undermining the general policies supporting the creation of the qualified immunity defense, inquiry into a public official's subjective motives could require "broad-ranging discovery" that was "peculiarly disruptive of effective government." *Id*. at 817. Thus, after *Harlow*, "no other 'circumstances' are relevant to the issue of qualified immunity" except the objective reasonableness of the defendant's conduct as measured by reference to clearly established law. *Davis v. Scherer*, 468 U.S. 183, 190 (1984) (quoting *Harlow*, 457 U.S. at 818).

## VI. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED:

1. Defendants' Motion for Summary Judgment (Dkt. 25) is **DENIED**;

2. Pursuant to Plaintiffs' counsel's stipulation during oral argument, Plaintiffs no longer seek relief against Superintendent Smyer and Assistant Superintendent Miller for Claim One. Superintendent Smyer and Assistant Superintendent Miller are accordingly dismissed with respect to Claim One;

3. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 26) is **GRANTED**. Although Plaintiffs are entitled to judgment finding Defendants liable for Claim Two, the issue of Plaintiffs' damages with respect to Claim Two has been neither argued nor decided and is reserved for trial;

4. By no later than **August 5, 2019**, the parties will need to submit their unavailable trial dates starting in January, 2020. Please also state how many days you believe it will take to try this matter. The Court will then enter a separate Trial Order that sets forth the trial date and various other pretrial deadlines.

DATED: July 26, 2019

David C. Nye
Chief U.S. District Court Judge